**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 12a0751n.06

**Nos. 11-5430, 11-5498**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| DREXEL CHEMICAL COMPANY, | ) | |
| | ) | **FILED**<br>*Jul 11, 2012*<br>LEONARD GREEN, Clerk |
| Plaintiff-Appellant Cross-Appellee, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE WESTERN |
| ALBAUGH, INC., | ) | DISTRICT OF TENNESSEE |
| | ) | |
| Defendant-Appellee Cross-Appellant; | ) | |
| | ) | |

BEFORE: GIBBONS, ROGERS, and COOK, Circuit Judges.

ROGERS, Circuit Judge. Drexel Chemical Company and Albaugh, Inc. entered into a written Agreement whereby Albaugh could make use of Drexel's registration to import and sell a pesticide called atrazine, which cannot be sold in the United States absent such registration. Drexel and Albaugh dispute several terms of the Agreement governing their relationship, as well as the factual question of when the Agreement was terminated. The district court incorrectly interpreted the Agreement as unambiguously providing that Albaugh was not required to make partial reimbursement for certain payments made after Albaugh terminated the Agreement, but relating to the period that the Agreement was in effect. Since the Agreement is ambiguous on this point, a remand is necessary to determine the intention of the parties. Apart from this interpretation issue, the district court committed no reversible error. The district court did not clearly err in its determination of when the Agreement terminated. The district court was correct in finding Albaugh

liable for half of a $1.5 million payment that Albaugh has contested, because that payment was made "in order to maintain the registration" under the terms of the Agreement. Finally, the district court did not abuse its discretion in assigning prejudgment interest.

I.

Atrazine is a pesticide developed by the predecessors of Syngenta Crop Protection, Inc., a group that included Novartis Crop Protection, Inc. Pesticide manufacturers who wish to sell products in the United States that contain atrazine are required under the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA), 7 U.S.C. § 136a, to register their products with the Environmental Protection Agency (EPA). The original registrant of a product conducts tests to confirm, among other things, that the product will not cause "unreasonable adverse effects on the environment," 7 U.S.C. § 136a(c)(5)(D), which in turn are submitted to the EPA. Subsequent applicants may use that data in their own applications for registration, a process referred to as "follow-on registration." Follow-on registration is only allowed if the subsequent applicant offers to pay data compensation to the original registrant; it is this data compensation that allows the follow-on registrant to rely on the data in their applications. 7 U.S.C § 136a(c)(1)(F)(iii).

Novartis was the original registrant of atrazine with the EPA. Drexel Chemical Company successfully negotiated with Novartis to obtain follow-on registration, allowing Drexel also to sell atrazine-containing products in the United States. In 1998, Albaugh, Inc. wished to begin selling atrazine, but could not reach an agreement with Novartis as to how much data compensation would be appropriate. Instead, Albaugh approached Drexel, whose registration with Novartis also had a

"follow-on" provision allowing other companies to use it. Drexel and Albaugh agreed that Albaugh would make use of Drexel's registration, and in exchange Albaugh would share in Drexel's data compensation obligation to Novartis. The companies entered into a written Agreement on December 7, 1998. Paragraph 2(iii) of the Agreement stated that Albaugh agreed to pay a lump sum of $750,000, and "[i]n addition, Albaugh shall pay fifty percent (50%) of the costs of all future payments that Drexel makes to Novartis in the future as data compensation in order to maintain the Registration."

Albaugh completed its $750,000 payment to Drexel on July 9, 2002. Under Paragraph 7 of the Agreement, Albaugh was allowed to terminate the Agreement at any time after that point.[1] The parties dispute when the Agreement was terminated. Albaugh claims that it terminated the Agreement on July 16, 2006, through an oral declaration by its President to Drexel's Chairman and CEO. Drexel claims that Albaugh terminated the Agreement by sending a letter on September 29, 2006. The letter stated:

> Pursuant to Section 7 of the above referenced Agreement dated December 7, 1998, Albaugh, Inc. hereby terminates said Agreement, and further requests that, within 30 days of the date of this letter, Drexel return, and certify in writing that it has returned and retains no copies of, all of Albaugh's and Atanor's confidential information that Drexel received pursuant to this Agreement.

---

[1]Paragraph 7 reads in full:

This Agreement shall terminate, and Albaugh shall not be obligated to make any further payments hereunder, upon EPA's refusal to amend the CSF for the Registration in the manner set forth in this Agreement. Albaugh may also terminate this agreement at any time after final payment of the $750,000 payment called for under paragraph 2(i) hereof.

During the years that Albaugh made use of Drexel's registration, Albaugh made no payments to Drexel related to the data compensation. Nor did Drexel make any payments to Novartis or its successor, Syngenta. Then, in September 2006, Syngenta informed Drexel that Drexel owed over ten million dollars in data compensation pursuant to a Special Review conducted in 2004 and 2005 by the EPA consistent with FIFRA's mandates. Drexel had been aware that this review was being conducted and in fact had made offers to pay during this period, consistent with the requirements of FIFRA. Drexel disputed the amount Syngenta claimed was owing, but decided to pay a portion of it. Drexel in turn sent an invoice to Albaugh dated September 25, 2006, for 50% of the payment it was about to make to Syngenta. On September 26, 2006, Drexel paid Syngenta $1.5 million. Three days later, Albaugh sent the termination letter mentioned above.

On May 15, 2007, Syngenta commenced arbitration proceedings with the American Arbitration Association pursuant to FIFRA because it could not reach an agreement with Drexel regarding the proper amount of data compensation owed. In March 2008, the arbitration panel determined that Drexel owed approximately $4 million to Syngenta as data compensation through 2008. The panel gave Drexel credit for the $1.5 million already paid, leaving an award of approximately $2.5 million. Drexel in turn filed suit against Albaugh, arguing that it owed Drexel half of this amount, in addition to half of the $1.5 million already paid.

Drexel originally filed a complaint in Tennessee court, but Albaugh removed the case to federal court on diversity grounds. Drexel's complaint alleged breach of contract and requested a

declaration of Albaugh's obligation to pay its share of data compensation costs. Both parties filed motions for summary judgment.

In its summary judgment ruling, the district court found that Albaugh was required to pay 50% of any payment made by Drexel to Novartis/Syngenta before the termination of the Agreement, but that there existed a genuine issue of material fact as to when the Agreement was terminated, and so a trial would be necessary. The parties agreed that it was appropriate to apply Tennessee law to the Agreement.

The district court also determined that Albaugh was not liable for any money paid by Drexel to Syngenta after termination of the Agreement. The district court found the language of the Agreement unambiguous on this point. The court read Paragraph 2(iii), with its requirement for paying "all future payments," in tandem with Paragraph 7, which allowed for termination after the initial $750,000 was paid, to mean that "when Albaugh terminated the Agreement in 2006, it was only required to reimburse Drexel for fifty percent of any payments Drexel made to Syngenta up to the point of termination." To find otherwise, according to the district court, would render Paragraph 7 meaningless: "[T]he only conceivable purpose for the termination clause in paragraph 7 was to relieve Albaugh of further obligations to pay Drexel for data compensation payments that Drexel might make to Syngenta after contract termination." The district court found that "Albaugh's obligation to pay Drexel under paragraph 2(iii) could only be triggered by a payment," not an offer to pay or any other action.

The district court rejected Albaugh's argument that the $1.5 million that Drexel had paid to Syngenta toward data compensation, because it was assertedly voluntary, was not made "in order to maintain the Registration" under Paragraph 2(iii). The district court pointed out that the language of the Agreement does not read "necessary to maintain the Registration," and the money was indeed made for the purpose of maintaining the registration. The district court concluded that under the ordinary meaning of the Agreement's language, "so long as Drexel's payment was made 'in order to' or 'for the purpose of' maintaining the registration, that payment would trigger Albaugh's obligation to pay Drexel fifty percent of the payment."

A bench trial was held on the question of the date of the Agreement's termination. Four witnesses testified, including Albaugh's President and Drexel's CEO, the two individuals who had the July 2006 conversation at issue. The conversation took place during a meeting of the Chemical Producers and Distributors Association, which both individuals attended. The conversation was not officially scheduled. Drexel's CEO testified that the conversation lasted no more than five minutes. According to him, Albaugh's President said to him, "Bob, we're thinking about getting out of the atrazine market." There was no follow-up to the conversation until the demand for payment to Syngenta was sent in September. Albaugh's President testified that he had made the decision to exit the atrazine market before the meeting and deliberately sought out Drexel's CEO to convey that information. He testified that such behavior was common in the industry, that the conversation lasted fifteen minutes, and that he informed Drexel's CEO "that we were exiting the atrazine

business and would sell our existing stocks, that we were terminating our contract with him." Evidence was also presented regarding behavior by both parties before and after the conversation.

At the conclusion of the trial, the district court found as a matter of fact that Drexel's CEO's version of events regarding the July 16 meeting was more credible, and that Albaugh's President had only told him "that Albaugh was 'thinking' about exiting the atrazine business." The district court supported its finding by pointing out that there was no evidence of planning the meeting, no evidence of follow-up after the meeting, and no reference to the meeting in the September 29 letter. The district court therefore concluded that Albaugh did not terminate the Agreement until September 29, 2006, and so owed Drexel 50% of the payment Drexel had made to Syngenta on September 26, 2006, i.e., $750,000.

The district court also awarded Drexel prejudgment interest on the $750,000, calculated from the date Drexel first sent the invoice at a rate of 7.5%. This amounted to $253,798.76. The district court relied on Tenn. Code § 47-14-123, which allows a court to award interest "in accordance with the principles of equity." The district court justified calculating the interest from the September 2006 date rather than from when the complaint was filed on July 18, 2008, because the court found that "Drexel was not inexcusably dilatory in pursuing its claim and, to the contrary, promptly made Albaugh aware that it was obligated to pay its fifty percent share." Drexel had requested 10% interest, the statutory maximum, but the district court said that rate was "not warranted, and that 7.5% is the appropriate rate."

Drexel and Albaugh both appeal.

II.

A.  Future Payments under the Agreement

The language of the Agreement is ambiguous as to whether Albaugh is responsible for payments that Drexel makes after the termination of the Agreement but relating to the period that the Agreement was in effect.  The single sentence that discusses the issue states that Albaugh is responsible for 50% of "all future payments" made "as data compensation in order to maintain the Registration."  The sentence is silent as to the outer limit of "future."  The language could mean payments made while the Agreement is in effect—as the district court read it—but it could alternatively mean payments made for data collected while the Agreement is in effect (or payments otherwise related to that time period), even if the payments are made after the Agreement is terminated.  This second interpretation gains some strength from the fact that the "future payments" are further described as those "Drexel makes to Novartis in the future as data compensation."  The repetition of "future" suggests that this requirement extends beyond the date of Agreement termination.  The language of the Agreement could even be said to have *no* outer limit for when Albaugh's payment obligations end, if read strictly literally.  Under Tennessee law, contractual language is ambiguous when "it is of uncertain meaning and may fairly be understood in more ways than one." *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006) (quoting *Farmers-Peoples Bank v. Clemmer*, 519 S.W.2d 801, 805 (Tenn.1975)).  This contract's language fits that description.

Because the Agreement is ambiguous, further factual development is necessary.  Under Tennessee law, when there are multiple plausible interpretations of contractual terms, courts should

not rely solely on a literal interpretation of the language to determine the contract's true meaning, but rather should apply rules of construction to determine the intent of the parties, including using extrinsic or parol evidence. *See Watson*, 195 S.W.3d at 611-12. In this case, further evidence may inform the proper interpretation of "future." We do not prescribe what evidence in particular should be put forth, but it could possibly include information about how certain terms are understood in the agricultural chemical business, particularly in the FIFRA regulatory context, the nature of the payments made to Syngenta, and previous agreements or correspondence between Drexel and Albaugh—whether or not the Agreement itself was being discussed. Evidence supporting Drexel's allegation that Albaugh continued to rely on Drexel's registration after the Agreement was terminated may also be taken into consideration.

Albaugh's explanation for why the Agreement is unambiguous is not convincing. Reading the Agreement to cover payments made after termination does not render Paragraph 7's second sentence meaningless. There are a number of reasons that might explain why the sentence was included in the Agreement, including to provide Albaugh with a means to exit the Agreement, or to prevent holding Albaugh responsible for data compensation ad infinitum. In addition, the first sentence of Paragraph 7 says that the Agreement "shall terminate, and Albaugh shall not be obligated to make any further payments hereunder," if EPA registration does not go through successfully. Reference to such further payment obligations is absent from the second sentence, which is the sentence in question here. The absence of this phrase in the second sentence makes it less plain that

termination by Albaugh after the $750,000 was paid means absolutely no post-termination payment obligation could arise. Factual development is required to interpret these provisions.

B. Date of Agreement Termination

The district court's conclusion that the Agreement was terminated on September 29, 2006, rather than on July 16, 2006, was not clearly erroneous, as Albaugh argues. The evidence could have supported either side's account of what was discussed at the July 16 meeting. Evidence supporting the district court's conclusion included: testimony from Drexel's CEO, which the district court found to be more credible than that of Albaugh's President; the lack of any evidence from Albaugh regarding planning for a termination meeting apart from testimony; the lack of any written evidence that there was follow-up regarding what was discussed; and the language of the September 29 letter, which made no reference to the meeting and suggested that the letter itself was meant to effect the Agreement's termination. Although evidence was presented that could have led a factfinder to the opposite conclusion as well, absent clear error, it is not our place to second-guess the district court's determination that Drexel's account was more credible than Albaugh's and was supported by more evidence. The district court's resolution of this factual issue was not clearly erroneous.

C. Nature of $1.5 Million Payment

The $1.5 million payment that Drexel made to Syngenta on September 26, 2006, was made "in order to maintain the Registration," and so under the Agreement Albaugh was liable for half of it, regardless of how the interpretational issue in Part A is resolved. The district court did not clearly

err in the factual findings undergirding this assessment, and its interpretation of the contractual language is correct. Drexel received a request for payment from Syngenta under the data compensation scheme outlined in FIFRA. Drexel paid $1.5 million toward this amount. The $1.5 million was therefore made for the purpose of maintaining the registration, and therefore triggered Albaugh's obligations under the Agreement.

Albaugh's characterization of the payment as "voluntary" is both inaccurate and somewhat beside the point. As the district court pointed out, "[c]ooperation in the data compensation scheme of FIFRA is essential to maintaining the product registration," and failure to participate can lead to suspension of the registration under 7 U.S.C § 136a(c)(2)(B)(iv). Drexel's payment qualified as participation; indeed, the arbitration panel ultimately credited it toward the amount Drexel owed Syngenta as data compensation. The fact that failure to make such a payment may not have led to an immediate loss of registration does not lessen its importance or keep it from being made "in order to maintain the Registration." The Agreement does not refer to payments *necessary* to maintain registration. A contract is enforced "according to the ordinary meaning of its words." *Moore v. Moore*, 603 S.W.2d 736, 739 (Tenn. Ct. App. 1980). The ordinary meaning of the words in the Agreement includes the $1.5 million payment. Although Albaugh argues that the Agreement refers to payments "required as part of [an] existing data compensation agreement between Drexel and Syngenta . . . [or an] existing data compensation arbitration decision between Drexel and Syngenta," the ordinary meaning of the words in the Agreement will not bear these additional requirements that Albaugh seeks to impose.

D. Prejudgment Interest Award

The district court acted within its discretion when it concluded that Drexel was not inexcusably dilatory in bringing suit against Albaugh, and so calculated prejudgment interest from the date Drexel sent an invoice to Albaugh, i.e., September 26, 2006. Albaugh's argument on this point is little more than a statement to the contrary, that Drexel *was* inexcusably dilatory. Albaugh raised the same argument below, where the district court was free to reject it, as it did. Under Tennessee law, awards of prejudgment interest depend on "whether the award of prejudgment interest is fair, given the particular circumstances of the case." *Myint v. Allstate Ins. Co*., 970 S.W.2d 920, 927 (Tenn. 1998). The district court was briefed on the particular circumstances of this case, and concluded that Drexel had acted reasonably and deserved the prejudgment interest awarded. No abuse of discretion took place.

III.

We remand this case for further proceedings consistent with this opinion.