**James L. HALE, Plaintiff,**

**v.**

**Bill JOHNSON, President and CEO, Tennessee Valley Authority, Defendant.**

**Case No. 1:15–cv–14**

United States District Court, E.D. Tennessee, Southern Division, at CHATTANOOGA.

Signed March 28, 2017

982

Robert Wisdom Wheeler, Douglas S. Hamill, Burnette, Dobson & Pinchak, Chattanooga, TN, for Plaintiff.

Edwin W. Small, Michael Vincent Bernier, Tricia L. Roelofs, Office of General Counsel, Knoxville, TN, for Defendant.

## ORDER

HARRY S. MATTICE, JR.

THIS MATTER is before the Court on the Motion for Summary Judgment (Doc. 10) filed by Plaintiff James Hale and the Motion for Summary Judgment (Doc. 25) filed by Defendant Bill Johnson. For the reasons set forth below, the Court finds that Plaintiff's Motion for Summary Judgment (Doc. 10) should be **DENIED**, and that Defendant's Motion for Summary Judgment (Doc. 25) should be **GRANTED IN PART** and **DENIED IN PART**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In this matter, Plaintiff James Hale alleges violations of the Rehabilitation Act, 29 U.S.C. § 701, which, *inter alia*, affords certain protections to disabled individuals employed by the federal government, its agencies, or contractors. From July 2009 to September 2013, Plaintiff served as a nuclear security officer ("NSO') at the Sequoyah nuclear plant in Soddy Daisy, Tennessee. (Docs. 1 at 2; 10–1 at 2–3). The Sequoyah plant is owned by the United States and operated by the Tennessee Valley Authority ("TVA"). The United States Nuclear Regulatory Commission ("NRC") grants TVA its requisite operating license, and issues guidelines that TVA must follow in operating the nuclear plant.[1] (Doc. 26 at 4). On the basis of these regulations, all security officers working at the Sequoyah plant must obtain and maintain a S11 medical clearance as a condition of their employment. (Doc. 10–2 at 13–15).

Plaintiff suffers from moderate chronic obstructive pulmonary disease ("COPD"); an illness that affects an individual's ability to breathe. (Doc. 10–5 at 2). The record reflects that TVA was aware of Plaintiff's COPD diagnosis when he was hired in 2009. (Doc. 10–2 at 33–34). Despite his condition, Plaintiff passed, and for the most part, excelled, at all TVA physical examinations. He satisfactorily maintained his S11 clearance in 2009, 2010, and 2011, scoring within the "fit" category for overall fitness and for numerous subcategories, including aerobic fitness. (Docs. 10–2 at

1. These regulations are codified in the federal register. *See, e.g.,* 10 C.F.R. Ch. 1, *et seq.* Especially relevant here is the section titled "General Criteria for Security Personnel. *See* 10 C.F.R. pt. 73 Fed.Appx. B. Further direction is provided by the NRC Regulatory Guides, which are of considerable length and complexity. According to the Commission, the Guides are meant "to provide[ ] guidance to licensees and applicants on implementing specific parts of the NRC's regulations." *See NRC Regulatory Guides,* https://www.nrc.gov/reading-rm/doc-collections/reg-guides/#guides (last visited March 27, 2017). For purposes of the instant action, the only relevant Guide is "Materials and Plant Protection;" specifically, Section 5.75 thereof.

29–30; 10–7). Plaintiff also completed an annual tactical weapons qualification course, which required him to run through a training course while firing at various targets. (Docs. 11 at 4; 10–2 at 6, 8–9).

Beginning in 2012, Defendant began a pilot program that changed the physical requirements for the S11 clearance examination. (Docs. 12–3; 26 at 5, 8). Specifically, Defendant required its NSOs to pass a pulmonary function test ("PFT"). (*Id*). The PFT requires the user to breathe into a mouthpiece that is connected to a spirometer and analyzes how well the lungs can quickly move large volumes of air. (Doc. 12–3 at 2). According to Defendant, the purpose of the PFT is to ascertain whether the NSOs can adequately breathe through a gas mask. Defendant contends that the PFT is a necessary in order to comply with guidelines established by the NRC, although the applicable guidelines make no mention of the PFT. (Doc. 26 at 5). Although the stated purpose of the PFT was to measure an NSO's ability to perform his or her job functions while wearing a gas mask, the test, rather curiously, does not require the NSO to wear a gas mask.

During the pilot stage, Plaintiff failed the PFT due to his COPD; however, because the test was not yet a mandatory component of the S11 clearance, Plaintiff was permitted to perform an alternate "practical" PFT, which he passed, thus securing his S11 clearance for 2012. (Docs. 10–2 at 31–32; 34–2 at 12–14).

Beginning in January 2013, Defendant made the PFT an official requirement for obtaining the S11 clearance. (Doc. 12–3 at 5). Although the testing requirements changed, the assigned duties and responsibilities of the NSOs did not. In March 2013, Plaintiff took his S11 clearance examination. Although he passed all other portions of the exam and scored well on the remainder of the physical testing, he failed the PFT. Plaintiff failed the PFT again in July 2013 and August 2013. (Docs. 11 at 5; 12–3 at 5). Plaintiff alleges that he asked TVA medical personnel if he could take the same practical PFT that he took in 2012, but they refused. (Doc. 15 at 12–13). Because he failed the PFT and was unable to obtain his S11 clearance, Plaintiff was terminated from his employment with Defendant on September 26, 2013. (Doc. 10–1 at 2).

Plaintiff originally filed a complaint with the Equal Employment Opportunity Commission ("EEOC") in October 2013. (Doc. 10–2 at 3). Ultimately, the EEOC failed to hold a hearing or issue its decision within the requisite timeframe. 42 U.S.C. § 2000e–16(c). Thus, on January 15, 2015, Plaintiff commenced the instant action. (Doc. 1).

Both parties have filed motions for summary judgment. (Docs. 10, 25).[2] The Court, having carefully reviewed the parties' submissions, finds that the issues in this matter are fully briefed and ready for disposition.

## II. STANDARD

In their respective cross motions, each party contends that he is entitled to judgment as a matter of law. Federal Rule of Civil Procedure 56 instructs the Court to grant summary judgment "if the movant shows that there is no genuine dispute as

**2.** Defendant filed his first Motion for Summary Judgment on May 14, 2015, in which he asserted that this Court lacked subject matter jurisdiction over Plaintiff's claims pursuant to Title VII's National Security exemption and the Supreme Court's *Egan* doctrine. (Doc. 13). The Court later denied the Motion, but certified its order for interlocutory appeal. (Doc. 27). The Sixth Circuit denied Defendant's interlocutory appeal on December 29, 2016. (Doc. 31).

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting the presence or absence of genuine issues of material facts must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). When ruling on a motion for summary judgment, the Court must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). The Court cannot weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party bears the initial burden of demonstrating that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. 2548. Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its ... pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586,

106 S.Ct. 1348; Fed. R. Civ. P. 56). The nonmoving party must present sufficient probative evidence supporting its claim that disputes over material facts remain and must be resolved by a judge or jury at trial. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475–76 (6th Cir. 2010). A mere scintilla of evidence is not enough; there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Moldowan*, 578 F.3d at 374. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548.

### III. ANALYSIS

■ Plaintiff brings two distinct claims under the Rehabilitation Act, 29 U.S.C. § 701, which applies to government agencies and incorporates the standards of the Americans with Disabilities Act ("ADA"). *See* 29 C.F.R. § 1614.203(b) ("The standards used to determine whether section 501 of the Rehabilitation Act of 1973 ... has been violated ... shall be the standards applied under Titles I and V (sections 501 through 504 and 510) of the Americans with Disabilities Act of 1990[.]"). Accordingly, cases addressing the ADA are generally relevant for purposes of resolving claims brought under the Rehabilitation Act. *Doe v. Salvation Army in U.S.*, 531 F.3d 355, 357 (6th Cir. 2008) ("We review claims brought under the Rehabilitation Act as we would claims brought under the Americans with Disabilities Act of 1990.").

Plaintiff first alleges that Defendant's PFT requirement has the unlawful effect

of screening out individuals with pulmonary issues; second, Plaintiff alleges that Defendant failed to afford him a reasonable accommodation. The Court will address each of these claims in turn.

## A. Disparate Impact

■ First, Plaintiff alleges what is known as a "disparate impact" claim, asserting that Defendant's "newly implemented PFT requirement has the effect of discrimination against individuals with pulmonary disabilities," such as himself. Disparate impact actions "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Int'l Bd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977); *see also* 42 U.S.C. § 12112(b)(3), (6) (ADA statute forbidding an employer from "utilizing standards, criteria, or methods of administration" that "have the effect of discrimination on the basis of disability" and from "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability.").

As an initial matter, it is not entirely certain that a disparate impact claims exists under the Rehabilitation Act, at least in the Sixth Circuit. *See Crocker v. Runyon*, 207 F.3d 314, 320 (6th Cir. 2000) ("[I]t should be noted that this circuit has not explicitly recognized the availability of a disparate impact cause of action under the Rehabilitation Act ... There is good reason to believe that a disparate impact theo-

ry is not available under the Rehabilitation Act."); *United States Soc'y for Augmentative v. Lyon*, 2016 WL 6563422, at *3 (E.D. Mich. Nov. 4, 2016) ("To begin with, it is unclear whether a disparate-impact cause of action under the Rehabilitation Act is available in the Sixth Circuit."); *Rumburg v. Sec'y of the Army*, 2011 WL 1595067, at *11 (E.D. Mich. Apr. 27, 2011) ( "Based on the language of *Crocker*, there is significant doubt, in this court's mind, as to whether a cause of action exists in the Sixth Circuit for disparate impact under the Rehabilitation Act.").

While the viability of such a claim may be in doubt within the Sixth Circuit, several other courts have affirmatively held that disparate impact claims are cognizable under the Rehabilitation Act. *See, e.g., B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) (outlining prima facie requirements for disparate impact claims under the Rehabilitation Act); *Prewitt v. U.S. Postal Serv.*, 662 F.2d 292, 306 (5th Cir. 1981) (same); *McWright v. Alexander*, 982 F.2d 222, 228 (7th Cir. 1992) ("[I]t appears that [plaintiff] may pursue her discrimination claim under a disparate impact theory."); *Anderson v. Duncan*, 20 F.Supp.3d 42, 53 (D.D.C. 2013) (holding that disparate impact claims may be asserted under the Rehabilitation Act by way of the ADA). [3]

The United States Supreme Court has provided little guidance on the issue; in fact, the Court's open-ended treatment of this very question has served to cloud already muddy water. *See Alexander v. Choate*, 469 U.S. 287, 304, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (assuming, without deciding, the viability of a disparate impact

---

**3.** The handful of courts that have ventured to analyze disparate impact claims under the Rehabilitation Act have candidly observed the endeavor's complexity:

> Because the Rehab Act incorporates the ADA, which is comparable for purposes of

disparate impact to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–17, analyzing Rehab Act claims premised on disparate impact is like unpacking a nesting doll.

*Anderson*, 20 F.Supp.3d at 54.

claim under the Rehabilitation Act); *see also Raytheon Co. v. Hernandez*, 540 U.S. 44, 52, 124 S.Ct. 513, 157 L.Ed.2d 357 (2003) (definitively holding that "[b]oth disparate-treatment and disparate-impact claims are cognizable under the ADA" but making no such finding as to the Rehabilitation Act).

█ In the end, the Court need not engage in this unsettled area of law. Even assuming that such a claim is available to Plaintiff, he has failed to adduce evidence sufficient to support a prima facie case. As stated by the Supreme Court, in order to establish a prima facie case of disparate impact, a plaintiff must: (1) "identify[ ] the specific employment practice that is challenged;" and (2) "offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 994, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988) (applying the aforesaid elements to disparate impact claims brought under Title VII); *see also Crocker*, 207 F.3d at 321 (reiterating these requirements when contemplating the merits of a disparate impact claim alleged under the Rehabilitation Act); *Anderson*, 20 F.Supp.3d at 54 (same). Once a prima facie case is established, the burden shifts to the defendant to show that the employment practice is a "business necessity." *Id.* (discussing the defense as outlined by the Supreme Court in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) and *Wards Cove Packing Co.*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989)).

Here, while Plaintiff has identified an allegedly discriminatory employment prac-

tice, he has offered no statistical evidence to support a conclusion that the "practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Watson*, 487 U.S. at 994, 108 S.Ct. 2777. Instead, Plaintiff only asserts that he himself suffers from pulmonary issues, and the PFT excluded him from employment on that basis. Citing the declaration of his personal physician, Plaintiff further argues in a summary fashion that, "it is unlikely that any person with moderate COPD such as [Plaintiff] could achieve" the requisite score on the PFT. (Docs. 11 at 7; 10–5 at 3). Finally, Plaintiff points to the deposition testimony of TVA Nurse Practitioner Gary Ellege, who "confirmed that [Plaintiff] would likely never pass the PFT due to his COPD." (Doc. 11 at 8; 10–2 at 11).

█ According to Plaintiff, these assertions constitute sufficient evidence to support his disparate impact claim. This is simply not the case. Not only must a plaintiff present statistical evidence in support of this particular cause of action, it must be evidence that is particularly compelling. Although relevant authority is hard to find specific to the Rehabilitation Act, the Sixth Circuit has rejected a disparate impact claim on the basis of lackluster statistical evidence. *Crocker*, 207 F.3d at 321 (denying relief where "[t]he number of other disabled individuals hired ... indicates no singling out of disabled applicants.");[4] *see also Shollenbarger v. Planes Moving & Storage*, 297 Fed.Appx. 483, 485 (6th Cir. 2008) (holding in connection to a Title VII disparate impact claim that courts should be wary of "incomplete or inapplicable analyses, simplistic percentage comparisons, and small samples sizes").[5] Further,

---

**4.** To be clear, the Sixth Circuit in *Crocker* first expressed considerable doubt as to whether a disparate impact claim is even available un-

der the Rehabilitation Act, matters of proof aside.

**5.** As to Title VII claims, both the Sixth Circuit

in regard to disparate impact claims, the Supreme Court has expressly held: "Our formulations . . . have consistently stressed that statistical disparities must be *sufficiently substantial* that they raise such an inference of causation." *Watson*, 487 U.S. at 994–95, 108 S.Ct. 2777 (emphasis added).

Here, Plaintiff fails to provide any statistical evidence whatsoever, and this failure is fatal to his claim. *See Turner v. City of Auburn*, 361 Fed.Appx. 62, 65 (11th Cir. 2010) (affirming dismissal of disparate impact claim where plaintiff "offered no statistical evidence in support"). Instead, Plaintiff devotes much of his brief to arguing that Defendant has failed to establish that the PFT qualifies as a business necessity, but this assertion is of little to no consequence where Plaintiff has not made a prima facie showing in the first instance. Accordingly, for this reason, summary judgment on this claim will be **DENIED** as to Plaintiff's Motion for Summary Judgment (Doc. 10) and **GRANTED** as to Defendant's Motion for Summary Judgment (Doc. 25).

### B. Failure to Accommodate

Plaintiff also alleges that Defendant unlawfully failed to accommodate his disability by refusing to offer him an alternative to the PFT. Pursuant to federal law, disability discrimination includes:

> Not making reasonable accommodations to the known physical or mental limita-

tions of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of such covered entity[.]

42 U.S.C. § 12112(b)(5)(A).

■ A plaintiff must prove five elements to sustain a reasonable accommodation claim under the Rehabilitation Act. He must show that: (1) he has a disability; (2) he is "otherwise qualified" for the position; (3) the employer knew or had reason to know of plaintiff's disability; (4) an accommodation was needed because a causal relationship existed between the plaintiff's disability and his request for accommodation; and (5) the agency did not provide the necessary accommodation. *See DiCarlo v. Potter*, 358 F.3d 408, 419 (6th Cir. 2004) (citing *Gaines v. Runyon*, 107 F.3d 1171, 1175–76 (6th Cir. 1997), overruled on other grounds by *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009)). Once this showing is made, the burden shifts to the employer to demonstrate that an accommodation would impose an "undue hardship." 42 U.S.C. § 12112(b)(5)(A); *Dicarlo*, 358 F.3d at 419. This framework will control the Court's analysis, as set forth below.

#### 1. *Whether Plaintiff Is Disabled*

■ The Rehabilitation Act, via the ADA, defines a "disability" as:

and Supreme Court have indicated that this particular kind of statistical evidence is not always necessary, noting that where "such labor market statistics will be difficult if not impossible to ascertain," plaintiffs will be subject to a more "relaxe[d]" requirement" in which "alternate statistics" may be allowed. *United States v. City of Warren, Mich.*, 138 F.3d 1083, 1093 (6th Cir. 1998) (citing *Wards Cove Packing v. Atonio*, 490 U.S. 642, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989) (superseded by statute on other grounds by 42 U.S.C. § 2000e–2(k))). Plaintiff does not ask for this

relaxed treatment of his Rehabilitation Act claim, however, and the Court would be remiss to afford it to him *sua sponte*. Even if the Court were to hold Plaintiff to this more liberal standard, the fact remains that he has failed to offer statistical evidence of any kind, meaning that his disparate impact claim does not pass muster. After all, in *City of Warren*, the Sixth Circuit spoke only of "alternate statistics" when considering whether a plaintiff had established a prima facie case, not the total lack thereof.

(i) a physical or mental impairment which substantially limits one ' or more of such person's major life activities;

(ii) a record of such an impairment; or

(iii) being regarded as having such an impairment.

29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(1); *see Salvation Army*, 531 F.3d at 357. "Courts are required to make a case by case determination of whether an individual qualifies as "disabled." *Id.* (citing *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 566, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999)). In 2008, the ADA was considerably altered by the passage of the Americans with Disabilities Act Amendments Act ("ADAAA"), whereby Congress provided additional guidance to courts regarding the "disabled" requirement of the ADA. Specifically, as noted by one court, the ADAAA commands that the "substantially limits" criterion of 42 U.S.C. § 12102(1), which is incorporated into the Rehabilitation Act via 29 U.S.C. § 705(20)(B), "is not meant to be a demanding standard." *Taylor v. Specialty Restaurants Corp.*, 2014 WL 4922942, *4 (S.D. Ohio Sept. 30, 2014). Rather, the ADAAA provides:

The primary purpose of the ADAAA is to make it easier for people with disabilities to obtain protection under the ADA. Consistent with the Amendment Act's purpose of reinstating a broad scope of protection under the ADA, the definition of "disability" in this part shall be construed broadly in favor of expansive coverage to the maximum extent permitted by the terms of the ADA. The primary object of attention in cases brought under the ADA should be whether covered entities have complied with their obligations and whether discrimination has occurred, not whether the individual meets the definition of disability. The question of whether an individual meets

the definition of disability under this part should not demand extensive analysis.

29 C.F.R. § 1630.1(c)(4). Even in light of this liberal standard, several district courts have noted that "the ADAAA left untouched the plaintiff's burden of proof; he still has to prove he has a disability." *Lloyd v. Hous. Auth. of the City of Montgomery, Ala.*, 857 F.Supp.2d 1252, 1263–64 (M.D. Ala. 2012); *see also Taylor*, 2014 WL 4922942 at * 5 (collecting cases).

■ Here, it is undisputed that Plaintiff suffers from COPD. Defendant asserts that Plaintiff has failed to demonstrate that his COPD diagnosis constitutes a disability under the Rehabilitation Act, arguing that he is fully able to work but simply "cannot meet the rigorous physical requirements" of the position he seeks. (Doc. 26 at 4). Defendant further argues that Plaintiff "lacks the specific ability to use a gas mask, [he is not] ... limited in any 'major life activity.'" (*Id.* at 15). Finally, Defendant points to Plaintiff's deposition testimony during the EEOC investigation, where he testified that he did not believe he was disabled. (Doc. 10–2 at 6).

■ In opposition, Plaintiff cites the following evidence: (1) that he failed three successive PFTs, the results of which showed that that he was unable to quickly move large volumes of air through his lungs relative to the rest of the population, which caused such distress in the testing physician that she expressed concern that Plaintiff was hypoxic (Docs. 34 at 5–6; 12–3; 15–1); (2) the sworn testimony of his treating · physician, Dr. Martinez, that Plaintiff's ability to exhale is only half that of his total lung capacity (Docs. 34 at 6; 34–1 at 4); and (3) that during the EEOC investigation of this case, TVA admitted that Plaintiff's "COPD is a physical impairment that substantially limits the major

life activity of breathing." (Docs. 10–4 at 4; 34 at 9–10).[6]

The Court notes that both parties have taken inconsistent positions during the course of this action as to whether Plaintiff is disabled. In his deposition with the EEOC, Plaintiff expressly disavowed the implication that he was disabled, now he affirmatively argues that he is. As for Defendant, during the EEOC investigation, he appeared to freely admit Plaintiff's disability; presently, he argues the opposite. Inconsistencies notwithstanding, however, the Court finds that Plaintiff has sufficiently established that he suffers from a disability, especially in light of the permissive standard set forth by the ADAAA. Plaintiff presents both objective medical evidence and the sworn testimony of his treating physician indicating that his ability to breathe is considerably hindered. As noted by Plaintiff, the ability to breathe is considered a major life activity under the ADA. (Doc. 11 at 6); 29 C.F.R. § 1630.2(i)(*l*)(i). Accordingly, Plaintiff has established the first element of his prima facie case.

### 2. *Whether Plaintiff is "otherwise qualified"*

█ In order for Plaintiff to establish that he was "otherwise qualified," he must show that he can perform the essential functions of the position sought, with or without a reasonable accommodation. 29 C.F.R. § 1630.2(m).

### a. Essential Functions

█ "An accommodation that eliminates an essential function of the job is not reasonable." *Hall v. United States Postal Serv.*, 857 F.2d 1073, 1078 (6th Cir. 1988). According to the applicable regulations, an essential function is defined as "the fundamental job duties of the employment position the individual with a disability holds or desires ... [it] does not include the marginal functions of the position." 29 C.F.R. § 1630.2(n)(1). Plaintiff has the burden of proving he was otherwise qualified, but Defendant must establish which functions of a job are essential. *Tolley v. Tennessee Valley Authority*, 2009 WL 151569, at *7 (M.D. Tenn. Jan. 21, 2009). The regulations also enumerate certain factors to be weighed in this analysis, which the Sixth Circuit has cited with approval:

(1) The employer's judgment as to which functions are essential;

(2) Written job descriptions prepared before advertising or interviewing applicants for the job;

(3) The amount of time spent on the job performing the function;

(4) The consequences of not requiring the incumbent to perform the function;

---

**6.** Defendant argues that his previous admissions during the EEOC investigation are inadmissible in this matter. (Doc. 12 at 14). Citing Federal Rule of Civil Procedure 36(a), which controls requests for admissions in civil actions and provides that the same may be used "for purposes of the pending action only," Defendant argues that, by analogy, its EEOC admissions may only be used for purposes of the EEOC investigation. Defendant further argues that the EEOC judicial handbook contains language similar to that in Rule 36(a). However, the judicial handbook provides only that: "[a]ny matter admitted is deemed conclusively established for the purpose of the pending dispute," not that the admissions are inadmissible elsewhere. *See* U.S. Equal Employment Opportunity Commission Handbook for Administrative Judges, available at https://www.eeoc.gov/federal/ajhandbook. cfm#discovery (last visited March 24, 2017). Given the scant authority cited by Defendant, the Court is not persuaded the Federal Rules of Civil Procedure apply to EEOC investigations, or that it may not rely on Defendant's EEOC admissions for purposes of summary judgment.

(5) The terms of a collective bargaining agreement;

(6) The work experience of past incumbents in the job; and/or

(7) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n)(3); *Brickers v. Cleveland Bd. of Educ.*, 145 F.3d 846, 849 (6th Cir. 1998). The inquiry into whether a function is essential is highly fact specific. *Hoskins v. Oakland Co. Sheriff's Dep't*, 227 F.3d 719, 726 (6th Cir. 2000) (citing *Brickers*, 145 F.3d at 849).

The parties disagree as to which "essential function" is relevant here. Defendant asserts that the ability to wear a gas mask, which can only be determined by passage of the PFT, is an essential function of the NSO position, and that Plaintiff's request that the PFT requirement be waived is therefore an unreasonable accommodation. (Doc. 26 at 18–20). Defendant explains that the security and protection of a nuclear plant, which could necessitate the use of a gas mask is "the reason the [NSO] position exists." (*Id.* at 19); 29 C.F.R. § 1630.2(n)(2)(i). In support of this assertion, Defendant offers the sworn declaration of Frank Little, the Senior Manager of Site Security at the Sequoyah nuclear plant. In the declaration, Little avers that Plaintiff's "primary duty was to protect the plant," and that due to "the unpredictable nature of attacks," NSOs must "be able to respond to any and all emergencies." (Doc. 25–19 at 1–2). Defendant also offers the NSO position description, which states that NSOs must "protect against radiological sabotage, internal and external threats," and "respond to nuclear emergency situations." (Doc. 12–6 at 5).

In response, Plaintiff asserts that Defendant's argument:

[I]s based upon the faulty premise that Plaintiff's inability to pass the Pulmonary Function Test ("PFT") automatically equates to Plaintiff's inability to perform his assigned tasks while wearing a gas mask ... Defendant has been forced to admit that the passage of the PFT itself—which is neither required by the NRC nor even mentioned in the NRC guidelines—is not an essential job function of a NSO. Rather, the ability to use a gas mask is the central issue in this case.

(Doc. 15 at 1).

Plaintiff is correct that the NRC regulations make no mention of the PFT, although they do reference medical examinations in connection with respiratory devices such as a gas mask. *See* 10 C.F.R. Pt. 73, App. B § VI(B)(2)(a)(1),(3); NRC Regulatory Guide 5.75 § 10.2(a)(1)(b). It is also worth noting that the PFT only became a requirement in 2013—four years after Plaintiff was hired as an NSO, which casts some doubt on how "essential" Defendant truly considered the PFT or some equivalent thereto. (D0c. 10–1 at 2–4; 10–4 at 3).

Plaintiff also takes issue with Defendant's argument that relevant regulations and the position description mandate the ability to breathe through a gas mask for an extended time period. Again, Plaintiff is correct that these regulations simply require that NSOs "demonstrate use of a gas mask"—not that NSOs be able to breathe through gas masks for hours on end, as Defendant appears to contend. *See* NRC Regulations 5.75 § 8.1.6, 8.1.11, 9.7, 9.7.1, 9.7.2. Defendant also references a TVA Nuclear Medical Services document listing the physical training requirements of a NSO, which lists the "[a]bility to wear a gas mask without compromise of respiratory capabilities." (Doc. 25–3 at 2).[7] Missing

---

7. It is unclear whether this document is intended to outline the NSO's job description or is simply an internal document circulated within the TVA medical department.

from this description, again, is the requirement that NSOs be able to wear the gas mask for an extended time period.[8]

At outlined above, Defendant bears the burden of showing which job functions are essential. *Tolley*, 2009 WL 151569 at *7. The Court is mindful of the Sixth Circuit's holding that the question of whether an activity is an "essential function" is highly fact specific. *Hoskins*, 227 F.3d at 726. Weighing the aforesaid factors, the Court finds that Defendants have failed to conclusively establish, first, that the ability to wear a gas mask for an extended period of time is an "essential function" of the NSO position, and second, that the PFT is the only way to gauge an individual's ability to wear a gas mask for the time period Defendant believes is necessary. In the Defendant's judgment, the ability to wear a gas mask, which is best determined by the PFT, is essential to an individual's ability to perform the duties of a NSO. The employer's judgment, however, is only one factor the Court may consider. 29 C.F.R. § 1630.2(n)(3); *Brickers*, 145 F.3d at 849. The "essential functions" Defendant cites are conspicuously absent from the applicable regulations, and the parties contest whether the PFT and ability to wear a gas mask constitute essential functions as a practical matter. Thus, on the current record, it appears that the trier of fact must resolve this dispute.

b. Reasonableness of Plaintiff's Accommodation

 "The plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow h[im] to perform the essential functions of her employment." *McBride v. BIC Consumer Prods., Mfg.*, 583 F.3d 92, 97 (2d Cir.2009). Plaintiff's burden of articulating a reasonable accommodation, however, need not be onerous. *See Cehrs v. Northeast Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 781 (6th Cir. 1998). "For the purposes of a prima facie showing, the plaintiff must merely 'suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits.'" *Id.* The Sixth Circuit has held that reasonable accommodations may include:

> making existing facilities used by employees readily accessible to and usable by individuals with disabilities, job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate **adjustment or modifications of examinations**, training materials or policies, the provision of qualified readers or interpreters and other similar accommodations for individuals with disabilities.

*Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir.2010) (citing 42 U.S.C § 12111(9)) (emphasis added).

 Defendant first argues that Plaintiff failed to request a reasonable accommodation of any kind. (Doc. 12 at 25).[9] If a disabled employee does not propose an accommodation, the "failure to accommodate" claim must fail. *Kocsis v. Multi–Care Mgmt.*, 97 F.3d 876, 883 (6th Cir.1996) (affirming summary judgment for defen-

---

**8.** Admittedly, Plaintiff's stronger argument, and the gravamen of his reasonable accommodation claim, is that the PFT is not the best way, and certainly not the only way, to determine his capacity to breathe through a gas mask in the manner and for the duration Defendant requires. In fact, Plaintiff insists that he is capable of using a gas mask in the event of a nuclear plant attack.

**9.** The Court notes that Defendant raised this argument at an early point in these proceedings and before significant discovery had taken place. Thus, it is unclear whether Defendant currently intends to advance this argument.

dant because plaintiff "never requested any accommodation from the defendant" and "testified several times that she was physically capable of performing the [job]."). The employee bears the initial burden of proposing an accommodation and showing that the requested accommodation is objectively reasonable. *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1183 (6th Cir. 1996). Further, a plaintiff's request for an accommodation cannot be vague, but instead, must "inform the defendant of what was needed[.]" *Benaugh v. Ohio Civil Rights Com'n*, 278 Fed.Appx. 501, 509 (6th Cir. 2008) (citing *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634–35 (6th Cir. 1998)).

Plaintiff argues that while he did not use the term "accommodation," he did ask TVA physicians if passage of the PFT could be waived, and reminded them of the practical test he was given the year before. Plaintiff asserts that this inquiry satisfied the requirement that he request a reasonable accommodation. (Doc. 15 at 12–13).

█ The Sixth Circuit has explicitly held that a plaintiff need not use the precise term "accommodation" for purposes of satisfying the requirements of a reasonable accommodation claim—there are no "magic words" that must be spoken. *Leeds v. Potter*, 249 Fed.Appx. 442, 449–50 (6th Cir. 2007) (citing *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004)). Rather, a plaintiff's request must only "make it clear from the context that it is being made in order to conform with existing medical restrictions." *Id.* at 449. Applying this standard to Plaintiff's version of events, the Court finds that a reasonable jury could find in his favor. Accordingly, the Court will move on to Defendant's next argument.

Second, Defendant argues that, evening assuming Plaintiff asked for the accommodation he alleges, his request was not reasonable. Specifically, Defendant contends

that "the accommodation [Plaintiff] seeks—waiver of the PFT and the use of a 'practical test'—would not make him qualified." (Doc. 26 at 25). According to Defendant, the practical test Plaintiff requests "would not satisfy TVA that he would be able to wear a gas mask for a prolonged period under the stress of an attack." (*Id.*).

As set forth above, Plaintiff claims that TVA physician Dr. Brenda Sowter allowed him to take a practical test in 2012 after he failed the PFT for the first time. Plaintiff testified at his deposition that the test took place inside the nuclear plant medical office. (Doc. 34–2 at 12). He testified that, at Dr. Sowter's command, he was required to put on a bulletproof vest and pick up his weapon and ammunition. (*Id.* at 13). He was also required to put on a gas mask, then had to complete "two or three exercises," one of which involved a stair-stepper. (*Id.* at 13). Plaintiff further testified that he had to run through an obstacle course, although he could not remember how long the course was or how long it took him to complete it. (*Id.* at 13–14). After the test, TVA health officials took his blood pressure and heart rate, expressed that "everything was fine," and sent Plaintiff back to work. (*Id.* at 14). For purposes of summary judgment, Defendant "presumes true" Plaintiff's account of the practical test. (Doc. 26 at 9).

Plaintiff also references a tactical weapons qualification test, where he was required to run through a training course while wearing a gas mask and accurately firing at various targets. (Doc. 11 at 4) According to Plaintiff, the test required him to move from a tower to the ground, jog a hundred yards, then move through additional components of the course. (Doc. 34–2 at 7). There was a time limit for completion. (*Id.*). When asked how long he wore the gas mask during the test, Plain-

tiff testified that the course took about "four and a half minutes, something like that," for him to complete, and he donned the gas mask halfway through. (*Id.* at 8–9). Plaintiff also testified at his deposition that the purpose of the test is to "see how you're reacting under stress." (*Id.* at 6–7). Plaintiff made a perfect score on the tactical weapons qualification test two years in a row, and he passed all other physical fitness tests required by Defendants.[10] (Docs. 11 at 4; 10–2 at 6, 8–9).

Plaintiff argues that both the practical PFT and tactical weapons course training demonstrate that he is capable of using a gas mask. In opposition, Defendant argues that the "gas mask is not the focus" of the tactical weapons course; rather, the point of the exercise is to "ensure that guards can properly don and doff gas masks while shooting accurately and communicating effectively." (Doc. 26 at 6).

Defendant also counters that Plaintiff's proposal is unsatisfactory because it does not "simulate a chemical attack." (Doc. 26 at 20). Defendant indicates that a sufficient practical test would "involve the use of chemicals" and take into account the "fight or flight" response that an NSO would experience during an attack. (*Id.* ).

In support, Defendant offers the sworn declaration of Dr. Sowter, who asserts that the PFT "is widely used in the medical field to test lung function." (Doc. 25–2 at 1). She further avers that sufficient lung

capacity is critical to using a gas mask for the following reasons. First, gas masks use an air-purifying filter that creates stress on the lungs, because the user has to increase breathing effort to pull air through the filter. Second, when an individual is in a stressful situation, one's body naturally demands more oxygen. On this basis, Dr. Sowter opines that an individual with limited lung volume would very likely be unable to protect the nuclear plant in the event of an attack. Finally, Dr. Sowter states that the practical test Plaintiff took in 2012 "was not intended to test [Plaintiff's] ability to use a gas mask during an attack," and that she disagrees "that the test occurred in the manner" Plaintiff alleges. (Doc. 25–2 at 2).[11]

Defendant also offers the expert report of Dr. John McElligot, who opines that Dr. Sowter's medical conclusions were reasonable based on the record. (Doc. 25–10). He also offers the following opinions: (1) that Plaintiff would be unable to protect the nuclear plant in the event of an attack due to his COPD; (2) that there is nothing TVA could do to eliminate the risk of harm to Plaintiff or others if he were allowed to continue to work at TVA; and (3) that it would not be a reasonable accommodation for TVA to allow Plaintiff to perform the type of practical test that he was given in 2012 or any other version thereof. (*Id.* at 5–6).

---

**10.** Defendant cites several other health problems Plaintiff currently suffers from or has suffered from in the past, including a heart attack and hypertension. (Docs. 26 at 10; 12–3 at 5). The PFT does not address these issues, however, and the health concern the parties contest is Plaintiff's COPD.

**11.** Dr. Sowter avers that the so-called "practical test" consisted of her taking Plaintiff's blood oxygen levels after walking around for a few minutes. (Doc. 12–3 at 4). She also claims that she only conducted the practical

test because she was concerned that Plaintiff was "hypoxic." (*Id.* at 3). According to Dr. Sowter, "hypoxia" is a condition where an individual does not have enough oxygen in the blood, and thus, there is a deficiency in the amount of oxygen that reaches the tissues. Dr. Sowter asserts that hypoxia can constitute a medical emergency as it can result in organ damage. (*Id.* ). Because Defendant presumes Plaintiff's narrative to be true for purposes of summary judgment, the Court need not address this alternative version of events. (Doc. 26 at 9).

Next, Defendant argues that applicable regulations require TVA to verify an NSO's ability to use a gas mask by way of a medical examination, not a practical test. (Doc. 26 at 4); 10 C.F.R. Pt. 73, App. B § VI(B)(2)(a)(1),(3). The accommodation Plaintiff proposes—wearing a gas mask while performing various physical tasks for a period time agreeable to Defendant— arguably comprises a medical examination of sorts, in that his performance would be observed by a physician, who would also take his vital signs and run other tests following its conclusion.

Defendant further argues that Plaintiff fails to submit evidence that his proposed practical test is a medically valid mechanism for proving the ability to use a gas mask. (*Id.*).[12] This contention, however, ignores the fact that Plaintiff was allowed to take a practical test in place of the PFT in 2012, in addition to satisfying all other physical prerequisites for the NSO position. While Defendant might presently deny that the practical test was, or could be, a sufficient proxy to the PFT, a reasonable jury could find otherwise in light of Plaintiff's testimony and other evidence of record.[13]

Finally, Defendant contends that because Plaintiff's requested accommodation was not agreeable to TVA, it was under no further obligation to find a mutually agreeable alternative. This does not reflect the current state of the law. As will be more fully set forth below, federal regulation, as well as the Sixth Circuit, mandate that employers engage in an "interactive process" once an employee requests an accommodation. *See* 29 C.F.R. § 1630.2 (o)(3); *Kleiber v. Honda of America Mfg*, 485 F.3d 862, 871 (6th Cir. 2007).

In the end, both parties submit extensive briefing and voluminous documents in support of their arguments, but the issue here is not especially complex. Defendant insists that Plaintiff asked TVA to waive all pulmonary medical tests, but this misconstrues his argument. The accommodation Plaintiff requests is not the total waiver of a test gauging his ability wear a gas mask—rather, Plaintiff requests an alternative version of the only test Defendant is willing to offer. Defendant appears to contend that the PFT is the sole means of discerning whether an NSO could adequately perform the requisite duties during an attack on the nuclear plant—but such a conclusion is not definitively supported by the record. A reasonable juror could find that an appropriate way to determine whether an individual can use a gas mask in the event of a chemical attack is for them to actually use the device dur-

---

12. In his Reply, Defendant argues that Plaintiff's reasonable accommodation claim fails because he "has not brought any relevant expert to this battle." (Doc. 40 at 6). The only authority Defendant cites is dicta from this Court's previous Order denying Defendant's first motion for summary judgment:

> [T]his case would likely involve a battle of the experts: Plaintiff would likely procure an "expert" licensed physician with experience in physical security requirements at nuclear or similar facilities to refute the testimony of Defendant's "expert" chosen physician that the physical testing requirements implemented at the Sequoyah facility were necessary under the NRC guidelines

and predictive of the employee's abilities to successfully complete his duties.

(Doc. 27 at 15 n.10). In its previous Order, the Court was merely speculating upon possible directions the evidence in this case might travel—it was not precluding all other paths to trial.

13. In Defendant's responses to Plaintiff's requests for admissions during the EEOC investigation of this matter, Defendant admitted that Plaintiff "passed a practical pulmonary function test administrated by Dr. Brenda Sowter" in 2012. (Doc. 10-4 at 4). Defendant protests that this document is inadmissible, but the Court disagrees for the reasons set forth above. *See supra* n. 7.

ing a simulation of some sort. Moreover, Defendant was apparently sufficiently satisfied with the results of Plaintiff's practical test to allow him to return to work for an entire calendar year, despite his argument that the PFT was absolutely essential.

As stated by the Sixth Circuit: "The reasonableness of a requested accommodation is generally a question of fact." *Keith v. Cnty. of Oakland*, 703 F.3d 918, 927 (6th Cir. 2013) (citing *Haschmann v. Time Warner Ent. Co.*, 151 F.3d 591, 601 (7th Cir. 1998) (denying employer's motion for summary judgment)). For the aforesaid reasons, Court finds that a genuine issue of material fact exists as to this issue, which precludes the grant of summary judgment.

### c. Direct Threat/Significant Risk

Defendant argues that Plaintiff is not "otherwise qualified" for the NSO position because "his continued employment as a nuclear security guard would have posed a direct threat to his own and others' safety." (Doc. 12 at 19). While Defendant uses the term "direct threat," the proper language under the Rehabilitation Act is "significant risk." *Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 287–88 n. 16, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987). Technically, the question of whether an employee poses a "direct threat" belongs to the ADA. *See* 42 U.S.C. § 12111(3); *Estate of Mauro v. Borgess Med. Ctr.*, 137 F.3d 398, 402 (6th Cir. 1998). This mistake is almost entirely inconsequential, however, as the Sixth Circuit has made clear that "[t]he 'direct threat' standard applied in the American with Disabilities Act is based on the same standard as 'significant risk' applied in the Rehabilitation Act." *Id.*

There are four factors to be considered in this analysis: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that the potential harm will occur; and (4) the im-

minence of the potential harm. 29 C.F.R. § 1630.2(r); *Estate of Mauro*, 137 F.3d at 402. An assessment of whether an employee poses a direct threat must be "individualized" to the employee's abilities and job functions and "based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence." 29 C.F.R. § 1630.2(r).

Defendant argues that "[h]arm to [Plaintiff] would be imminent and definite if the plant is attacked and he cannot wear a gas mask." (Doc. 12 at 21). Defendant further argues that "[i]n light of his safety-centric job duties and individual medical situation, it was objectively reasonable for TVA to conclude that [Plaintiff] posed a direct threat." (Doc. 12 at 21).

In this case, it remains unclear on the current record whether Plaintiff posed a "significant risk" such that his reasonable accommodation claim is barred. If Plaintiff is indeed unable to adequately breathe through a gas mask, and the ability to do so is established as an "essential function," then Defendant's argument might take the day. The Court, however, cannot answer this question at the present juncture for the reasons set forth above.

### 3. Whether Defendant Knew of Plaintiff's Disability

█ An employer knows an employee has a disability for the purposes of a disability discrimination claim "when the employee tells the employer about the condition, or when the employer otherwise becomes aware of the condition, such as through a third party or by observation. The employer need only know the underlying facts, not the legal significance of those facts." *Karlik v. Colvin*, 15 F.Supp.3d 700, 708 (E.D. Mich. 2014) (citing *Schmidt v. Safeway, Inc.*, 864 F.Supp. 991, 997 (D. Or. 1994)).

Here, Defendant was clearly aware of Plaintiff's breathing problems. TVA physicians took note of Plaintiff's COPD diagnosis when he was hired. (Doc. 10–2 at 33–34). Moreover, TVA physicians undoubtedly knew of and discussed Plaintiff's pulmonary issues at length after he failed the PFT. Accordingly, this element is easily satisfied.

#### 4. Whether an Accommodation Was Needed

██ Plaintiff must also show that an accommodation was needed, in that a causal relationship exists between Plaintiff's disability and his requested accommodation. *DiCarlo*, 358 F.3d at 419. As outlined above, Plaintiff failed the requisite PFT several times before his termination, which directly relates to his COPD diagnosis. Accordingly, on the current record, he has established that he required an accommodation.

#### 5. Whether Defendant Refused a Reasonable Accommodation

██ Pursuant to federal regulation:
To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome these limitations.

29 CFR. § 1630.2 (*o*)(3). This process "requires communications and good-faith exploration of possible accommodations." *Kleiber*, 485 F.3d at 871. "Even though the interactive process is not described in the statute's text, the interactive process is mandatory, and both parties have a duty to participate in good faith." *Id.* "An employer has sufficiently acted in good faith when it readily meets with an employee, discusses any reasonable accommodations,

and suggests other possible positions for the Plaintiff." *Jakubowski*, 627 F.3d at 203.

██ Plaintiff claims that Defendant failed to engage in the requisite "interactive process." (Doc. 15 at 13–14). Defendant clearly knew that Plaintiff's COPD prevented him from passing the PFT. Plaintiff also asked Defendant if he could take a practical PFT while wearing a gas mask, but this request was denied. According to Plaintiff, this exchange "certainly triggered" the interactive process requirement. (*Id.* at 13). Defendant does not address this argument except to assert that Plaintiff never asked for an accommodation. (Doc. 12 at 25–26).

Viewing the evidence in the light most favorable to the Plaintiff, he has at least shown a dispute of material fact that Defendant failed to engage in an "interactive process" to determine if a reasonable accommodation was possible. For this reason, summary judgment in favor of either party is improper.

#### 6. Undue Hardship

██ Once a plaintiff establishes a prima facie case, the burden shifts to the employer to demonstrate that the employee cannot reasonably be accommodated because the accommodation imposes an undue hardship. *DiCarlo*, 358 F.3d at 419. This "requires a detailed showing that the proposed accommodation would 'requir[e] significant difficulty or expense' in light of specific enumerated statutory factors." *Rodal v. Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 121–22 (2d Cir. 2004).

██ Defendant alleges that creating and implementing a practical test that would serve as the equivalent of the PFT would be "costly, time-consuming, and ... extremely unsafe," but his argument in this regard is terse, undeveloped, and unsupported by record evidence. (Doc. 12 at 23). Given that undue hardship requires a

"detailed showing," the Court finds that Defendant has failed to carry his burden, and that this matter should proceed to trial.

## IV. CONCLUSION

For the reasons set forth above, the Court orders as follows:

1. Plaintiff's Motion for Summary Judgment (Doc. 10) is **DENIED;**

2. Defendant's Motion for Summary Judgment (Doc. 25) is **GRANTED IN PART and DENIED IN PART;**

3. Plaintiff's disparate impact claim is **DISMISSED WITH PREJUDICE;** and

4. Plaintiff's reasonable accommodation claim remains before the Court.

**SO ORDERED** this 28th day of March, 2017.